UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.

METRO SOUTH SENIOR APARTMENTS
LIMITED PARTNERSHIP, a Florida limited
partnership,

        Plaintiff,

vs.

CITY OF SOUTH MIAMI, a Florida
Municipal Corporation,

        Defendant.
_____/

## COMPLAINT

Plaintiff, Metro South Senior Apartments Limited Partnership, a Florida Limited Partnership ("MSSA") hereby sues Defendant, City of South Miami ("City"), and states:

## INTRODUCTION

1. This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-back yard.

2. By this action, MSSA claims that the City has blocked, based on discriminatory animus, the zoning approval, financing, construction and occupancy of 91 units of affordable housing for senior citizens, most of whom are current and predicted disabled persons, by denying MSSA a reasonable accommodation of either a reasonable zoning boundary change (to allow uniform height of the proposed project) or an adjustment from City parking requirements which far exceed standard parking ratios for affordable senior housing, in violation of the federal Fair Housing Act ("FHA") and the Americans With Disabilities Act ("ADA").

3. Specifically, the City refuses to grant a reasonable accommodation from its requirement of two parking spaces per unit, even though the proposed housing will conservatively average only 1.2 residents per unit, and most of those residents will be disabled with no vehicles necessitating any parking spaces.

4. The City has not attempted to hide its discriminatory animus regarding MSSA's proposal. For example, one Commissioner sponsored a resolution to officially block MSSA's application for tax credits. Another openly declared, after noting that the City already had two major hospitals for the "psychologically imbalanced," two public housing projects, and one senior center, stated: "I don't know what this city is turning into . . . but we were at one point a residential community, but it's falling apart." At an earlier City Commission meeting, which had been called to target Plaintiff's project with a moratorium, another commissioner stated:

> "In a city of eleven thousand residents, if we have the wrong types, too many of the wrong type of whatever, the burden is going to be on the taxpayer...it's going to be on the rest of the City. So what's going to happen is...at the end of the day...those residents who are aging in their homes and have no desire to move into a three hundred dollar, five hundred square foot apartment, are basically going to be the ones that are screwed, because they are the ones who are going to have to pick-up the tab for those people that are in the three hundred dollar apartments."

## PARTIES

5. Plaintiff, MSSA, is a Florida Limited Partnership and the beneficial owner of property located at 6101 Sunset Drive, more particularly described in attached Exhibit A ("subject property" or "proposed housing").

6. Plaintiff's proposed residents will be senior citizens, most of whom have or will have disabilities which trigger the protections of the ADA and FHA. According to the 2010 Census, 56.7 million Americans have some type of disability, which represents 18.7% of the

relevant population studied (i.e., people who were age 5-and-older in the civilian non-institutionalized population). Matthew W. Brault, U.S. Dep't of Commerce, *Americans With Disabilities: 2010* (July 2012), at 5, http://www.census.gov/prod/2012pubs/p70-131.pdf. The census data show both that a disproportionate number of these disabled persons are elderly and that, as people grow older, they are increasingly likely to have a disability. Indeed, the 2010 Census data probably understate the degree of disability in the elderly population, because they consider only non-institutionalized persons, *id.*, and a substantial number of the 65-and-over age group is institutionalized, presumably mostly for health-related reasons. *Id.* at 6.

7. Defendant, City of South Miami, is a Florida municipal corporation. As such, it is and was acting under color of state law.

8. The City exercises enforcement and interpretive authority over zoning ordinances, and otherwise provides municipal services.

9. The City is responsible for the acts of its agents and employees and is responsible for the enforcement of its zoning, building and property maintenance codes. The City is a public entity under the ADA, 42 U.S.C. § 12131.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 1343, 42 U.S.C. § 3613, and 42 U.S.C. § 12133. In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(d) over Plaintiff's claim for declaratory relief.

11. Declaratory and injunctive relief is sought pursuant to 42 U.S.C. § 3613(c) (1) and 42 U.S.C. § 12133, as well as Rules 57 and 65 of the Federal Rules of Civil Procedure.

12. Venue is proper in the United States District Court for the Southern District of Florida as all acts complained of occurred within this District.

## GENERAL ALLEGATIONS

13. MSSA has legal and equitable interests in the subject property as the assignee of a July 2011 contract to purchase the subject property from its present owner, 6101 Sunset LLC. (A copy of the operative November 2011 assignment is attached hereto as Exhibit B.)

14. MSAA contracted to purchase the subject property for the sole purpose of constructing a 91-unit senior apartment complex, utilizing federal tax credits for the provision of affordable housing. This use would not only be consistent with the existing zoning of the subject property but would further goals of the City's Comprehensive Plan to encourage high density development within an identified transportation oriented district (a.k.a. "TODD area") and increase the availability of additional affordable housing units.

15. In addition to the substantial expenses associated with securing the availability of the subject property, MSSA has invested substantially in efforts to obtain an award of tax credits and third party financing for the project as well as in the architectural, engineering, zoning and permitting activities pre-requisite to construction.

16. All 91 units were designated as income restricted and reserved for persons earning no more than 28% to 60% of the area median income. Because of the income restrictions, the monthly rents for the units were below market rate and ranged from approximately $300 to $750, depending on household size and level of income.

17. MSSA's project was intended to be financed using state allocated tax credits under the Low Income Housing Tax Credit program ("LIHTC"), 26 U.S.C. § 42 *et seq*. The LIHTC program provides federal tax credits to private developers in exchange for limiting the development's occupancy and rents to low income households.

18. The tax credits are allocated in a competitive process to projects by the Florida Housing Finance Corporation ("FHFC"), a legislatively created entity that administrates public funding for affordable housing.

19. In 2011, MSSA obtained an award of Low Income Housing Tax Credits for this proposed housing from the FHFC, which ranked the subject property as the #1 qualifying recipient site in the state for that year.

20. The federal tax credit program requires that all buildings be placed in service within two years from the time of the tax credit allocation. More critically, as a result of the Housing and Economic Recovery Act of 2008, the applicable percentage for 9% LIHTC developments is fixed until December 31, 2013 after which time the percentage returns to a much lower floating rate. If this date is missed, MSSA will suffer damages due to a loss in the amount of federal tax MSSA will be eligible to receive.

21. The subject property is comprised of three adjoining lots, located at the corner of S.W. 61st Avenue and Sunset Drive. The southern lot fronting on Sunset Drive and the middle lot are both zoned Transit Oriented Development District Mixed Use-5 ("MU-5"), the text of which permits residential development to a height of four stories, with the possibility of bonuses up to eight stories. The northern "rear" lot (Folio #09-4025-011), however, falls within the boundary of the Transit Oriented Development District Mixed Use-4 ("MU-4") zoning category, the text of which limits residential development to a height of two stories.

22. Because the boundary between MU-5 and MU-4 transects the subject property, preventing development to an even height for the rear lot, MSSA applied to move the MU-5 boundary to the north of the rear lot, in order to resolve this split zoning problem and facilitate a building envelope that would permit construction of industry sized units, while also meeting the

City's unusually high residential parking ratio of 2.0, which is over double the amount necessary for senior housing by industry-wide standards. (All 91 units need to be large enough to be either disabled accessible or adaptable because 19 of the 91 units must be disabled accessible and the residents of the 19 disabled accessible units should be able to visit the remaining units. Moreover, many residents will develop disabilities as they age in place).

23. In January 2012, MSSA applied for a zoning map amendment that would move the MU-5 boundary to the north edge of the subject property; accordingly the rear lot of the subject property would be encompassed within the MU-5 zone like the rest of the subject property. The application made clear that allowing uniform zoning across the subject property would not increase the requested number of housing units (91 units as-of-right), but would resolve design constraints caused by the height difference at the existing MU-4 / MU-5 boundary line. MSSA's application is attached as Exhibit C (hereafter "Application").

24. The Application was supported by City planning staff, as reflected in the March 20, 2012 Memorandum from the City Planning Director (attached hereto as Exhibit D), MSSA's requested boundary change was consistent with the City's Comprehensive Plan objectives and would resolve the "unusual" and "not desirable" circumstance of having a small MU-4 area surrounded on all sides by higher development.

25. Notably, the City staff memorandum acknowledged that the City's 2.0 parking ratio is excessive based on national standards for development within transit districts. (affordable or not), which typically require only between 1.0 or 1.5.  (This was before any additional consideration of national standards for senior housing for which standard ratios are even lower).

26. The Application came before the City Commission on March 20, 2012.  During the public hearing, no members of the community expressed any opposition.  After presentations

by City planning staff and representatives of MSSA, the Commission voted 4-1 in favor of granting the Application.

27. Notwithstanding this favorable vote, the City adopted the legal position that approval of the boundary change required a unanimous vote of the Commission and that the motion to approve MSSA's application had therefore failed. This denial of MSSA's application was documented through the City Commission Meeting After Action Summary attached hereto as Exhibit E (see particularly, item 16, page 4).

28. Further, on March 27, 2012, and in a further attempt to discriminate against MSSA, the City passed a resolution to draft a moratorium ordinance against multifamily development such as the proposed housing. Commissioners also discussed other ways to derail MSSA's proposal, none of which were eventually approved.

29. Within a week of this action, the City called a special meeting solely to consider adoption of an official resolution opposing MSSA's pending application for tax credits and to place a moratorium on multifamily development. The resolution specifically named the street address of MSSA's proposed project. The agenda for this special meeting, held March 27, 2012, is attached hereto as Exhibit E, including the proposed resolution to oppose MSSA's senior affordable housing project.

30. On first reading of this proposed resolution at the March 27, 2012 special meeting, the language overtly targeting MSSA's project was deleted to make it appear as though the purpose of the resolution was merely a general moratorium to allow study of multifamily use City-wide. However, the disingenuous nature of that asserted purpose became evident on second reading (which occurred on May 15, 2012) during which the proposed general multifamily planning moratorium failed.

31. Because of the City's failure to properly acknowledge the 4-1 approval of the Application and permit MSSA to proceed, MSSA timely petitioned for relief under the Florida Land Use & Environmental Dispute Resolution Act, Chapter 70.51, Florida Statutes ("FLUEDRA") citing the unreasonableness of the denial on several grounds including MSSA's position that unanimous vote was not required by the City's Charter and that therefore a zoning boundary change entitling MSAA to construct to a uniform height of 8 stories had actually been approved.

32. On June 8, 2008, the parties participated in duly noticed proceedings before a special master appointed under FLUEDRA that were open to the public, pursuant to section 70.51 (17) and (19) of the Act.

33. During the recorded mediation phase of those proceedings representatives of the City expressed concern about a height of eight stories at the northern boundary of the project and suggested a step-down transition from eight (8) to four (4) to two (2) stories toward the rear of the project. City representatives also expressed a desire to see commercial uses (particularly restaurant) in the ground floor of the project to promote mixed uses in that area of the City.

34. Without prejudice to its legal position that its requested zoning boundary amendment had been approved on March 20, 2012, MSSA expressed willingness to accommodate those concerns in a re-design of the project, but that doing so would necessitate some relief from the City's 2.0 ratio for residential parking. MSSA indicated that an adjustment to the City's 2.0 ratio was also reasonable because 1.0 or even lower residential parking ratios have been widely acknowledged in the senior housing industry and by numerous government agencies as sufficient for senior housing. (MSSA later provided documentation of this to the City in the form of a signed and sealed report by a qualified traffic engineer, compiling national

research and numerous examples of parking requirements tailored to senior housing, including those in neighboring jurisdictions).

35.     The parties' discussions during this public mediation resulted in the issuance of a recommendation by the appointed special master that the proceedings be suspended before formal hearing in order for the parties to pursue a modified project design.

36.     Accordingly, MSSA expedited, at great time delay and expense, plan revisions to modify the project design as discussed and submit revised site plans and an implementing development agreement, as allowed by FLUEDRA, to the City for review by July 2, 2012.

37.     The City then advertised notice of intent to consider the proposed implementing development agreement at two public hearings before the City Commission to be held August 7 and 21, 2012.  MSSA also provided mailed notice of these public hearings to property owners within a 500' radius.

38.     The Commission considered the modified design and associated development agreement at the August 7, 2012 public hearing.  Members of the Commission expressed concern about aspects of the agreement and ways in which they would like to see it revised.  In response to concerns about the number of residential parking spaces proposed in the modified design, MSAA presented the sworn testimony of a qualified traffic engineer and his report documenting national and local research and senior parking codes in other area municipalities evincing that the industry standard parking ratio for senior housing is between .5 and .8 per unit, and provided copies of his report to each Commissioner.  Further, and as noted above in ¶ 25, the City's planning staff also noted that the City's 2.0 parking space ratio is excessive based on national standards for development within transit districts. At the conclusion of the hearing, the

Commission voted to continue consideration of the proposal at the scheduled August 21, 2012 public hearing.

39. In the interim before the August 21, 2012 hearing, MSSA agreed to several revisions to the development agreement in good faith efforts to meet the stated concerns, and in some instances, demands, of various commissioners for matters such as providing a 1.0 ratio of residential parking spaces, guaranteed tax payments, perpetual landscaping maintenance, and monetary contributions for park space. During the August 21, 2012 public hearing MSSA agreed to additional park space contributions, to build a public crosswalk on Sunset Drive, and to guarantee sufficient parking by paying into the City's parking fund if future parking analyses at the project demonstrated a shortage of parking. Notwithstanding all these accommodations offered by MSSA, the Commission voted against entering into the proposed development agreement.

40. The parties' inability to reach settlement of their dispute through FLUEDRA proceedings perpetuated the dispute between the parties concerning whether or not a unanimous vote of the Commission was required to approve MSSA's Application to move the MU-5 boundary (which would have obviated the need for any parking ratio adjustment).

41. The City asserts a unanimous vote was required under Article II, Section 6(D) (1) of its Charter as amended in 2008. That provision requires that five affirmative votes of the city commission are required "to amend land use and development regulations in any manner to make them less restrictive." However MSSA's Application did not propose to amend either the MU-4 or MU-5 regulations themselves. It sought only to move a boundary line on the City's zoning map.

42. Significantly, at the time of the 2008 Charter amendment, boundary changes were separately defined in the City's code from land use or development regulations. Accordingly, upon adoption of the 2008 Charter amendment adding Section 6(D), the citizens did not vest individual commissioners with this "veto" power over mere boundary changes such as the one sought by MSSA.

43. The City Commission had attempted to sweep boundary changes within the scope of the 2008 Charter amendment by subsequent adoption of Ordinance 32-09-2024 (a copy of which is attached as Exhibit F) under the guise of "clarifying" the scope of the 2008 Charter Amendment. However, under Florida law, charters may only be amended by vote of the people and not by mere ordinance, Ordinance 21-09-2024 could not have legally subjected boundary amendments such as the one sought by MSSA's Application to the unanimous vote requirement, which the people had logically limited to only substantive amendments of underlying regulations themselves.

44. On August 27, 2012, the City Commission met to consider Plaintiff's proposed development agreement. At that meeting, MSSA specifically requested reasonable accommodations under both the ADA and FHA that the parking space ratio be reduced from 2.0 per unit to 1.0 (i.e., 182 spaces to 91), because the proposed housing will average only 1.2 residents per unit, and most of those residents will be disabled with no vehicles necessitating any parking spaces.

45. The City rejected that request on a 4-1 vote in part, as stated by one Commissioner, because the City already had two major hospitals for the "psychologically imbalanced," two public housing projects, and one senior center: "I don't know what this city is turning into . . . but we were at one point a residential community, but it's falling apart."

**STATUTORY AND REGULATORY FRAMEWORK**

46. In 1988, Congress amended the FHA, 42 U.S.C. § 3601, *et seq*., to extend the guarantee of fair housing to handicapped individuals. Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations to implement the FHA. 42 U.S.C. § 3614a.

47. Under the FHA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h).

48. Under the FHA, it is unlawful to discriminate against, otherwise make unavailable to, or deny a dwelling to, any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

49. The FHA further provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of that person or persons residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(2).

50. The federal regulations implementing the FHA specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap. 24 C.F.R. 100.70(d)(4).

51. The federal regulations implementing the FHA further make it unlawful, because of handicap, "to restrict or attempt to restrict the choices of a person by word or conduct in

connection with seeking, negotiating for, buying or renting a dwelling so as to . . . discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a).

52. The ADA requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

53. The federal regulations implementing the ADA prohibit a public entity from administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. § 35.130(6).

54. The federal regulations implementing the ADA also make it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to, discrimination. 28 C.F.R. § 35.130(4)(I).

**The FHA and the ADA as Applied to MSSA, Its Residents, and the City**

55. MSSA's future residents are primarily persons with current and predicted disabilities under both the FHA and ADA, and therefore are a protected class.

56. The proposed housing are dwellings within the meaning of § 802(b) of the FHA, 42 U.S.C. § 3602(b).

57. Both the FHA and the ADA prohibit discrimination against people with disabilities based on: (1) disparate treatment, also called intentional discrimination; (2) failure to accommodate; or (3) disparate impact, also called discriminatory effect.

58. One or more of the commissioners have made statements opposing MSSA's application, and have attempted to erect tax and other financial barriers to this proposed housing, all of which demonstrate their discriminatory animus against this protected class of persons.

59. The City's requirement of a 2:0 parking ratio has a disparate impact on disabled, senior citizens. It also constitutes discrimination in the provision of terms, conditions, and privileges on the ability of the Plaintiff to provide affordable housing to disabled senior citizens.

60. Alternatively, a local government's refusal to make a reasonable accommodation to reduce its arbitrary, overbroad, and counter-industry parking ratio constitutes another form of discrimination under the FHA and ADA. The City refused to tailor its excessively high parking requirement to industry standards for either senior housing or (as counseled by its own in-house planning department) to transit oriented development. Enforcement of the City's 2.0 parking ratio makes it both prohibitively expensive, and in this case, impossible to develop the proposed handicap accessible / adaptable units, given the City's refusal to grant a height increase on the rear third of the site to facilitate more parking and concurrent demand for the addition of parking-intensive commercial space to the project as a condition of approval. Stated differently, under the City's code, the City refused to reduce its standard parking requirements from 182 spaces for non-disabled residents to 91 units for seniors who are or will be disabled.

61. MSSA also seeks declaratory, preliminary and permanent injunctive relief to enjoin the City's conduct, monetary damages, costs and reasonable attorneys' fees.

62. MSSA and its residents are aggrieved persons as they are disabled persons or associated with disabled persons under the FHA and ADA who have been injured by the City's discriminatory conduct and have suffered damages in lost or delayed housing opportunities, in

lost or delayed revenue, lost opportunity, frustration of mission, diminution of market share, and other damages.

63. The City's actions effectively deny needed housing opportunities to persons with disabilities within the City.

64. The City's conduct effectively limits the housing opportunities of disabled persons by denying them the right to live in affordable housing in an urban environment near public transportation within the City.

65. The City has acted under color of state law in failing to affirmatively further fair housing in its zoning activities with the purpose and effect of discriminating against MSSA and its residents solely because of their disability, and is applying those codes so as to deny MSSA and its residents the residential opportunities available to non-disabled persons.

66. MSSA's future residents are being denied the home of their choice and are suffering anxiety, emotional distress, pain, and other irreparable harm as a result of the City's actions. They have no adequate remedy at law.

67. The City has failed to affirmatively further fair housing in the administration and application of its zoning code.

68. Plaintiff was awarded Federal Low Income Housing Tax Credits in the amount of $2,526,858 annually for 10 years, which was then syndicated resulting in an equity investment in the amount of $26,024,035. Because of the City's actions, Plaintiff will not be able to close on the development by or around September 29, 2012, meaning the proposed housing will not be able to be completed by the end of 2013, which is a critical date in which a federal stimulus provision was put into place in 2008, allowing a significant boost of funding along with incentives to investors which expire at the end of 2012 all of which are necessary to make the

development feasible. In addition, Plaintiff has expended thousands of affiliated staff hours developing the proposed housing, at an average hourly rate of $125.00 and more than $1,500,000 in third party and development related costs.   Without the full use of the Low Income Housing Tax Credits, the owner will lose the amount of $26,024,035, which comprises almost 87% of the necessary funding to develop the property in order to serve low income senior and disabled households.

## **CLAIMS FOR RELIEF**

### **Count I**
### **Fair Housing Act**

69.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 68 above.

70.     The City is intentionally interfering with MSSA's residents and persons associated with MSSA's residents with the intent of preventing the proposed housing from existing in the City.

71.      The City is violating MSSA and its residents' rights under the FHA, 42 U.S.C. § 3601 *et. seq*, and its implementing regulations, by:

      a.     denying and otherwise making housing unavailable to MSSA and its residents because of their disability;

      b.     using the City's zoning code as a pretext to exclude MSSA and its residents because of their disability;

      c.     enforcing discriminatory zoning rules and policies against MSSA and its residents because of their disability;

      d.    interfering with the right of MSSA and its residents to live in the dwelling of their choice;

      e.    failing to make reasonable accommodations in the City's zoning code so as to afford the Plaintiff and its residents an equal opportunity to use and enjoy the aforementioned dwelling;

      f.    retaliating against Plaintiff and its residents because of their exercise of their fair housing rights; and

      g.    steering individuals with disabilities away from certain housing opportunities.

## Count II

### Americans With Disabilities Act

72.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 68 above.

73.    MSSA is associated with, and/or providing housing to, people with disabilities as defined in 42 U.S.C. § 12102(2).

74.    The City is a public entity under 42 U.S.C. § 12131(1).

75.    The actions of the City to exclude MSSA and its residents from residential zones violate the rights of MSSA and its residents under the ADA, 42 U.S.C. § 12132 *et seq*., and the regulations promulgated thereunder, by:

      a.    denying MSSA's residents the opportunity to participate in or benefit from the affordable housing program offered by MSSA;

    b. using land use ordinances and methods of administering those ordinances with the purpose of subjecting MSSA and its residents to discrimination on the basis of their disability;

    c. subjecting MSSA and its residents, on the basis of their disability, to discrimination;

    d. denying MSSA's residents, an opportunity to live in the most integrated setting appropriate to their needs; and

    e. denying MSSA's residents and people with disabilities an equal opportunity to participate in or benefit from services and programs equal to those of people without disabilities.

## Count III

### Declaratory Relief

76. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 68 above.

77. There is an actual, bona fide and justiciable controversy existing between MSSA and the City, concerning whether an application by MSSA for a zoning boundary change was legally approved on March 20, 2012.

### RELIEF SOUGHT AS TO ALL COUNTS

WHEREFORE, Plaintiff requests the following relief:

1. Enter preliminary and permanent injunctions ordering the City to grant Plaintiff's request for reasonable accommodation for the proposed housing and/or enjoining enforcement of the City's excessive 2.0 parking ratio;

2. Enter a declaratory judgment that the City has illegally discriminated against MSSA and its residents by arbitrarily and capriciously applying its zoning code to the MSSA's proposed housing, thereby interfering with MSSA and its residents' equal opportunity to use and enjoy dwellings on the basis of disability, in violation of the Fair Housing Act and the Americans with Disabilities Act;

3. Enter a declaratory judgment that Ordinance 21-09-2024 did not have the effect of amending Article II, Section 6(D)(1) of the City Charter to require unanimous approval of a zoning boundary change; and

4. Enter a declaratory judgment that MSSA's Application was legally approved at the public hearing held March 20, 2012

5. Enter preliminary and permanent injunctions enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from interfering in any way with MSSA's and its residents' rights to reside in and enjoy those premises;

6. Enter preliminary and permanent injunctions enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from actively assisting the City in its efforts to interfere with the rights of persons with disabilities to reside at the proposed housing.

7. Award damages for lost or delayed profits, lost financing, lost opportunity, frustration of mission, diminution of market share, and any other damages;

8. Grant an award of reasonable costs and attorney's fees; and

9. Order such other relief as the Court deems just and proper.

Respectfully submitted,

s/<u>James K. Green</u>
James K. Green, Esq.
JAMES K. GREEN, P.A.
Suite 1650, Esperantè
222 Lakeview Ave.
West Palm Beach, FL 33401
(561) 659-2029
(561) 655-1357 (facsimile)
Florida Bar No: 229466
jameskgreen@bellsouth.net

**ATTORNEY FOR PLAINTIFF**